# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ANDREW JAMES STAMM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:11-cv-01686-TWP-MJD |
| TIGERTECH INVESTMENTS, INC., | ) | |
| doing business as | ) | |
| MIKADO JAPANESE RESTAURANT | ) | |
| | | |
| Defendant. | | |

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' cross-motions for summary judgment. Plaintiff, Andrew James Stamm ("Mr. Stamm"), brought this action under 42 U.S.C. § 1981, Title VII of the Civil Rights Act, the Fair Labor Standards Act ("FLSA"), Indiana's Wage Claim statute, and breach of contract (Dkt. 20). Defendant TigerTech Investments, doing business as Mikado Japanese Restaurant ("Mikado"), moved for summary judgment on all claims. Mr. Stamm moved for summary judgment on his FLSA retaliation claim, Indiana wage claim, and breach of contract claim. For the following reasons, Mikado's motion for summary judgment (Dkt. 34) is **GRANTED in part** and **DENIED in part,** and Mr. Stamm's motion for summary judgment (Dkt. 47) is **DENIED**.

# I. <u>BACKGROUND</u>[1]

The essential facts of this case, as best determined from the parties' submissions, are as follows.[2]

Mr. Stamm, is a white male and an American citizen.  Mikado, is a Japanese sushi restaurant owned by Yu Mei Lee and managed by her daughter, Connie Lee.  Mr. Stamm first worked at Mikado in 2001.  He left Mikado in 2003 to attend law school.  In December 2008, Mr. Stamm returned to work at Mikado as a sushi chef, which was considered a kitchen, or "back-of-the-house", position.  He was hired by both Ms. Yu Mei Lee and Ms. Connie Lee. When Mr. Stamm was hired, he initially agreed to work 37 hours per week.  He was paid $300.00 per week, which was roughly based on an $8.00 per hour wage.  It is unclear, however, whether Mikado and Mr. Stamm agreed to a set "salary" or "hourly" compensation agreement.

---

[1] The Local Rules require a movant for summary judgment to set forth a "Statement of Material Facts Not in Dispute," containing the facts "that are potentially determinative of the motion."  L.R. 56-1.  A non-movant is required to set forth a "Statement of Material Facts in Dispute," containing potentially determinative facts and factual disputes precluding summary judgment.  The Court reminds the parties that only facts *material* to the outcome of the case need be set forth and disputed in summary judgment filings.  It is not determinative of the claims in this case whether, for example, Mr. Stamm and Ms. Connie Lee's friendship deteriorated, or whether Mr. Stamm "grunted" at Ms. Connie Lee.  *See* Dkt. 35 at 9.  Nor do the details about Mr. Stamm's and Ms. Connie Lee's joint trip to Las Vegas and stay at the MGM Hotel, Mr. Stamm's trips to California or that a gentleman named Tiger Lee from Shanghai provided Ms. Yu Mei Lee money to purchase Mikado, bear any relation to the merits of the claims.  *See* Dkt. 36 at 2–4.  The parties' exhaustive dispute over many of the non-substantive facts presented by the other party needlessly diverts attention from the material facts of the case, causes the Court to sift through unnecessary materials and adds substantial length to the parties' briefs.

[2] After reviewing the depositions and affidavits submitted by the parties, the Court *sua sponte* omits those portions of Mr. Stamm's affidavits that do not comply with Federal Rule of Civil Procedure 56(c)(4).  Rule 56(c)(4) requires that supporting affidavits used to oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."  An affidavit may not be based upon "self-serving statements . . . without factual support in the record." *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 781 (7th Cir. 2006) (citation omitted).  Affidavits must cite "specific concrete facts establishing the existence of the truth of the matter asserted."  *Hadley v. Cnty. of DuPage*, 715 F.2d 1238, 1243 (7th Cir. 1983).  Several paragraphs in Mr. Stamm's affidavits contain statements that constitute inadmissible opinions, speculation, or legal conclusions.  The Court has considered the affidavits to the extent the facts are admissible, and in the interest of brevity, will not recount each of the inadmissible portions in this Entry.  Suffice to say, Mr. Stamm is not harmed by the Court's omission of portions of the affidavits from the Court's consideration.

At the time Mr. Stamm was hired, Mikado employed full-time dishwashers and kitchen staff, all of whom were Hispanic or of Mexican nationality.  The dishwashers worked between 50 and 63 hours each week on a fixed salary.[3]  Mikado also employed Ernesto Paez as a head sushi chef and Carlos Chacon, who worked a full-time schedule as a sushi chef, kitchen staff member, and dishwasher.

In February 2009, Mr. Stamm worked 55 hours in one week.  When he received his paycheck for this time period, Mr. Stamm believed he had been undercompensated.  He reported his belief to Ms. Yu Mei Lee, and possibly Ms. Connie Lee.  Mikado interpreted Mr. Stamm's complaint as a request to be converted from a salaried employee receiving $300.00 fixed salary per week to an hourly employee receiving $8.00 per hour, plus overtime pay when required.  Mikado also paid Mr. Stamm $200.00 to resolve the pay dispute.  Mr. Stamm disputes that he requested to become an hourly employee or that he had ever agreed to be salaried.

In April 2009, citing slow business, Mikado reduced Mr. Stamm's schedule from approximately 37 hours per week to 25 hours per week.  Mr. Stamm disputes this fact and alleges that his hours were reduced because he complained about not being paid for overtime.  He further alleges he was the only back-of-the-house employee working less than 63 hours per week and that another back-of-the-house employee, Juan Avilla was moved from part-time to full-time during this time period.  Mikado asserts that the slow business did not affect the hours required of dishwashers, who continued to work full-time 50 to 63 hour shifts.

Beginning in July 2009, Mr. Stamm requested more shifts at Mikado, including hours as a dishwasher.  Mr. Stamm alleges that on five or six occasions, a dishwasher position was

---

[3] In 2011, Mikado underwent a wage audit by the U.S. Department of Labor ("DOL").  The DOL concluded that Mikado's practice of paying dishwashers on a fixed salary without overtime pay violated the FLSA.  Mikado maintains that prior to this audit, it in good faith believed its pay practices were proper and it was not required to pay salaried employees for overtime.

available and despite his request to work as a dishwasher, Mikado only hired Hispanic men to fill the position.  Additionally, Mr. Stamm alleges Ms. Connie Lee told him, "white people do not want to do that work."  Dkt. 36 at 12.  To the contrary, Mikado alleges Mr. Stamm was unwilling to accept the position at a dishwasher wage and he never specifically asked to be a dishwasher.

Also in the summer of 2009, Mr. Stamm complained to Mikado that he was not receiving his fair share of the sushi chef tip portion.  Mikado explains that the long-standing sushi chef tip policy was as follows:  when patrons sitting at tables order sushi and leave tips, 60% of that tip is given to the table's server.  The remaining 40% of the tip is allocated for the sushi chefs.  Of that 40%, 60% is given to the head sushi chef.  The remaining 40% is given to the assistant sushi chef.  For clarity, the Court will refer to this 40% split among the sushi chefs as the "sushi chef tip portion."  Mr. Stamm alleges that when he was hired, Ms. Connie Lee promised him 50% of the sushi chef tip portion.  When he complained he was not receiving 50% of tips in the summer of 2009, Ms. Connie Lee explained he was entitled to only 40%.

In early January 2010, Mr. Stamm emailed Ms. Connie Lee with concerns that his schedule was being changed and that his "vigilance in enforcing [his] rights" was impacting his ability to get shifts at the restaurant.  On January 28, 2010, Mr. Stamm emailed Ms. Connie Lee about the sushi chef tips, and that he calculated that Mikado had unlawfully withheld $657.75 of tips.  He also asked her for documents that would help him determine the hours and dates he had worked.  On February 2, 2010, Mr. Stamm emailed Ms. Connie Lee that he had been singled out as the only back-of-the-house employee to receive reductions in work and pay.  He complained that he had been passed over for opportunities and that he no longer had a set schedule of shifts. Also on February 2, 2010, Mr. Stamm emailed that the reduction in his earning and hours was

4

stressful, and he was concerned Ms. Yu Mei Lee would fire him.  Ms. Connie Lee responded that

Mr. Stamm would not be fired and that they should speak about his concerns.

The next email provided to the Court is dated February 18, 2010, from Mr. Stamm to Ms.

Connie Lee stating, "So, does that mean you're not going to pay it?  If so, that's your choice, but

I will continue to pursue it through other means."  Dkt. 48-3 at 28.  In response to that email, on

February 19, 2010, Ms. Connie Lee wrote to Mr. Stamm that the tipping policy in place would

not be changed, and she stated "but like [I] said in the previous email[,] do what you have to do."

Dkt. 36-6 at 14.  In response, Mr. Stamm emailed, "I think I've been clear that the main issue is

your discriminating against me in regard to shifts, but you've chosen to ignore that."  Dkt. 36-6

at 14.

On March 11, 2010, Mikado gave Mr. Stamm a memo explaining that because he could

not keep up with sushi orders during his Saturday night shift, he was being moved to Tuesday

nights.  On March 26, 2010, Mr. Stamm emailed Ms. Connie Lee requesting several dates off

work in April.  On March 28, 2010, Ms. Connie Lee responded in emails that Mr. Stamm's

requests might not be granted, because Mikado may be unable to cover the shifts.  On March 29,

2010, Ms. Connie Lee granted Mr. Stamm's request for time off on April 5, 8, 19, and 22, 2010.

Mr. Stamm responded by email stating that he also needed several Tuesdays, April 6, 13, 20, and

27, 2010, off.  He explained that he could not be "scheduled unilaterally" to work on Tuesdays

per his contract.  Dkt. 35-2 at 45.  Ms. Connie Lee responded that Mr. Stamm was required to

work Tuesdays, which Mr. Stamm rejected.  The two continued emailing into the early hours of

March 30, 2010, negotiating the days Mr. Stamm would not be scheduled to work.  They agreed

Mr. Stamm could have April 1, 5, 8, 19, 20, 22, 26, and 29, 2010 off.  Mr. Stamm then filed his

discrimination charge with the Equal Employment Opportunity Commission ("EEOC") on April 6, 2010.

The record indicates that Mr. Stamm, in addition to the agreed upon dates, did not work scheduled shifts on April 6 and 15, 2010. On April 10, 2010, Ms. Connie Lee emailed Mr. Stamm that if he could not work a scheduled shift that he should find someone to work in his place or call Mikado. On April 19, 2010, Mikado sent Mr. Stamm a memo informing him that his absences on April 6 and 15, 2010 were unexcused and unacceptable. The memo served as a written warning and set forth the discipline procedure for future unexcused absences.[4] Mr. Stamm maintains that Ms. Connie Lee gave him oral permission to miss work on April 15, 2010, and otherwise disputes that his absences were unexcused.

On May 9, 2010, Ms. Connie Lee offered Mr. Stamm a nighttime dishwasher/janitor position. On May 11, 2010, Mr. Stamm rejected the position, but stated that "if one of the full time +/- 62 hours a week positions becomes available consider me very interested." Dkt. 36-6 at 15.

On May 13, 2010, Mr. Stamm emailed Ms. Connie Lee and requested he no longer work on Mondays and Sunday, May 23, 2010. On May 15, 2010, Mikado denied his request and stated that Mr. Stamm was expected to work all Mondays and on Sunday, May 23, 2010. Mr. Stamm did not work on Monday, May 17, 2010, and the next day Mikado sent Mr. Stamm a memo and second warning about unexcused absences. Mikado suspended Mr. Stamm for two shifts and stated that if Mr. Stamm could show documentation for why his absences should be excused, the policy would be revisited. On May 18, 2010, Ms. Connie Lee offered Mr. Stamm a position as the morning dishwasher/janitor. Mr. Stamm rejected the position. Mr. Stamm

---

[4] Mr. Stamm alleges he was the only back-of-the-house employee to whom this procedure applied. Mikado alleges that although the procedure was applied to other employees who missed work, Mr. Stamm was the only employee to refuse shifts, which required multiple warnings.

responded to Mikado's memo on May 19, 2010.  In an email, Mr. Stamm said he was "very unhappy with [Mikado's] decision to continue to violate [his] legal rights."  Dkt. 36-6 at 17.  He further stated that he would not work May 23, 2010, and proffered a reason for his May 17, 2010 absence.  The email also included a dispute about his paycheck and the sushi chef tips.

On May 21, 2010, Ms. Connie Lee emailed Mr. Stamm the following, "You must work both your shifts this Sunday the 23rd.  You cannot dictate your own schedule. . . .  If you do not have your shifts covered this Sunday, your employment with Mikado will be terminated due to insubordination and unexcused absences."  Dkt. 36-6 at 17.  Mr. Stamm did not work on the 23rd, did not find someone to cover his shifts, and Mikado terminated his employment on May 24, 2010.  Mr. Stamm asserts that he "considered himself fired before ever receiving" the May 18, 2010 memo, because he alleges that in early May, Ms. Yu Mei Lee called Mr. Stamm into her office and told him he had done a "very bad thing" and that he was "going to be fired."  Dkt. 36 at 25.  However, Mikado denies this incident occurred, and alleges that Ms. Connie Lee terminated Mr. Stamm without consulting Ms. Yu Mei Lee.

On May 25, 2010, Mr. Stamm filed a retaliation charge with the EEOC.  On September 30, 2011, the EEOC issued determinations on Mr. Stamm's discrimination and retaliation charges.  On the discrimination charge, the EEOC stated that it found "reasonable cause to believe that violations of the statute(s) had occurred . . . but could not obtain a settlement."  Dkt. 1-1 at 1.  On the retaliation charge, the EEOC stated that it was "unable to conclude that the information obtained establishes violations of the statutes."  Dkt. 1-2 at 1.  Both charges were dismissed by the EEOC and Mr. Stamm was granted a right to sue on both charges.

On December 15, 2011, Mr. Stamm filed a wage claim with the Indiana Department of Labor.  On February 28, 2012, the Office of the Attorney General granted Mr. Stamm the right to pursue his wage claim against Mikado.

## II. <u>LEGAL STANDARD</u>

Summary judgment is only appropriate by the terms of Rule 56(c) where there exists "no genuine issue as to any material facts and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56.  *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir.1996).  Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact.  *R.J. Codman Derailment Serv., Inc. v. Int'l Union of Operating Eng.'s.*, 335 F.3d 643, 647 (7th Cir. 2003).  Rather, the process of taking the facts in the light most favorable to the nonmoving, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial.  *Id.* at 648.  "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made."  *Oregon v. Arbitration Forums, Ins.*, 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## III. <u>DISCUSSION</u>

### A. **Claims under 42 U.S.C. § 1981 and Title VII**

The heart of Mr. Stamm's allegations relate to race discrimination and retaliation.  As an initial housekeeping matter, it is worth noting that Mr. Stamm's discrimination and retaliation claims are brought under both Title VII and § 1981.  From a practical standpoint, this is a

distinction without a difference.[5]   These claims, although brought under different statutes, are functionally identical; therefore, the same analysis will apply.  *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) (utilizing same analysis for § 1981 and Title VII); *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010) (same).  Mr. Stamm's race discrimination claims and retaliation claims are addressed in turn below.

### 1.   Race Discrimination

#### a.   Legal Principles

It is well-established that a plaintiff may prove discrimination in one of two ways: either through direct evidence, or indirectly through the burden-shifting mechanism of *McDonnell Douglas*.  *See Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000) (citation omitted).  A brief review of each is instructive.

Under the direct method, a plaintiff may proffer direct or circumstantial evidence to prove discrimination.  Direct evidence establishes "the fact in question without reliance on inference or presumption."  *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (citation omitted).  Such evidence is rare.  After all, even the most heedless employer is unlikely to make such overt and damning admissions.  Nonetheless, a plaintiff can still prevail under the direct method by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decision maker."  *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citation and internal quotations omitted).   "That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action."  *Id.* (citation and internal quotations omitted).

---

[5] Mr. Stamm claims that Mikado did not seek summary judgment on his § 1981 claims; however, the Court finds that Mikado moved for summary judgment on all claims and did not distinguish its race discrimination arguments between § 1981 or Title VII.

Alternatively, a plaintiff can use the indirect method of proof, which consists of three basic steps: (1) a plaintiff must establish a prima facie case of discrimination based on race, (2) if he does so, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse action, and (3) the plaintiff must then come forward and show the stated reason is pretextual. *See Henderson*, 207 F.3d at 376.   A plaintiff establishes a prima facie case by establishing evidence that would allow a reasonable jury to find on each claim that:  (1) he is a member of a protected class; (2) he applied for and was qualified for the position; (3) he was rejected for the position sought; (4) the position was granted to an individual outside of the protected class who was either similarly qualified or less qualified than plaintiff. *Grayson v. City of Chi.*, 317 F.3d 745, 748 (7th Cir. 2003).

Mr. Stamm argues under both approaches.  But regardless of whether he proceeds under the direct or indirect method, Mr. Stamm must also establish that he suffered a material adverse employment action in order to survive summary judgment. *See Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 730 (7th Cir. 2009) ("[T]o succeed on . . . discrimination claims, [the plaintiff] must demonstrate a materially adverse employment action that resulted from the alleged discrimination to survive summary judgment." (citation omitted)).   As the Seventh Circuit has recognized, "[t]he idea behind requiring proof of an adverse employment action is simply that a statute which forbids *employment* discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 654 (7th Cir. 2000) (collecting cases).  Furthermore, the adverse employment action requirement exists "in order to distinguish meritorious cases from 'trivial personnel action[s]' brought by 'irritable, chip-on-the-shoulder employee[s].'" *Lewis v. City of*

*Chi.*, 496 F.3d 645, 653 (7th Cir. 2007) (quoting *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744–45 (7th Cir. 2002) (citations omitted)).

On this point, the Seventh Circuit has instructed that, "[a]lthough we define adverse employment action broadly, not everything that makes an employee unhappy is an actionable adverse action. For an employment action to be actionable, it must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis*, 496 F.3d at 653 (quoting *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000)). In other words, it is well-established that an adverse employment action "must materially alter the terms and conditions of employment." *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001) (citation omitted). Further, the Seventh Circuit has recognized three categories of actionable materially adverse employment actions:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing [him] from using [his] skills and experience, so that the skills are likely to atrophy and [his] career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of [his] present job altered, but the conditions in which [he] works are changed in a way that subjects [him] to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [his] workplace environment.

*Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009) (citation and quotations omitted).

11

### b.      Mr. Stamm's Claims

Mr. Stamm's claims rest on being denied the opportunity to work more hours as "full-time," or 63 hours per week.[6]   He argues that he expressed his willingness to work as a dishwasher multiple times, but was told, "white people don't want to do that work."  Dkt. 36 at 32.  He further argues that other, non-white employees were allowed to work a combination of positions within the restaurant to reach 63 hours, but he was not given the same opportunity.

Mikado argues that Mr. Stamm was unwilling to work the dishwasher position at the dishwasher rate of pay, which was a fixed salary of between $323.00 and $369.00 per week for full time shifts of between 50 and 63 hours per week.[7]   Put another way, a dishwasher's equivalent hourly wage could be calculated as between $5.38 and $7.38.  As stated earlier, Mr. Stamm's hourly wage was $8.00, and when he was offered dishwashing hours, it was at a wage of $7.25.  In response to the offer to work as a dishwasher six days per week from 5:30 p.m. until the restaurant closed, at a wage of $7.25, Mr. Stamm responded that he could not "accept a change to a position that requires me to work more hours on more days for less money hourly and less total."  Dkt. 36-6 at 15.  Instead, he reiterated his interest in a "+/- 62 hour" per week position.  Mr. Stamm was never given a dishwasher position or a full-time schedule.

The Court is hard pressed to fit Mikado's failure to move Mr. Stamm into a dishwasher position into the "adverse employment action" category.  The crux of Mr. Stamm's position is that he was not considered for full-time employment, while only Hispanic candidates were hired for that position.  Yet it is unclear if, and Mr. Stamm does not argue that, the increase in hours or

---

[6] On the basis of the briefing before the Court, Mr. Stamm appears to allege his termination was a result of retaliation, not discrimination.   Therefore, the Court will not consider Mr. Stamm's termination as part of his discrimination claim.

[7] Ms. Connie Lee testified and attested that dishwashers worked 50-60 hours per week.  Mr. Stamm testified and argues that dishwashers work 63 hours per week.

change in position would have been a promotion or a raise to which he was entitled. *See generally Griffin v. Potter*, 356 F.3d 824, 829–30 (7th Cir. 2004) (noting that the denial of a raise can constitute a materially adverse employment action if that raise was "an expected element of the employee's salary and its denial cuts the salary in real terms"); *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 900 (7th Cir. 2003) (noting that moving to a higher paid position is a promotion and "the denial of an opportunity to move to the position . . . constitutes a materially adverse employment action"). It is undisputed that dishwashers worked more hours than Mr. Stamm, and some dishwashers were paid more per week than Mr. Stamm. Yet, when calculated as an hourly wage, dishwashers received less hourly compensation than Mr. Stamm. Taking these factors into consideration, a dishwasher position cannot be considered a "higher paid position" because the actual rate of pay is less than Mr. Stamm earned.

Furthermore, twice, Mr. Stamm was offered a dishwashing position for less than or approximately 40 hours per week[8] at a $7.25 wage, but he refused. Specifically, he was not willing to "accept a change to a position that requires me to work more hours on more days for less money hourly and less total." Dkt. 36-6 at 15. Had Mikado offered Mr. Stamm 63 hours at $7.25, plus the time and a half for the hours over 40 per week, Mr. Stamm would have been paid much more than the other dishwashers. This sort of "raise"[9] was not an "expected element" of Mr. Stamm's employment.

Therefore, the Court finds that Mr. Stamm has not established an essential element of his claim for race discrimination: an adverse employment action. "Not everything that makes an employee unhappy is an adverse employment action; an adverse action is one that significantly alters the terms and conditions of the employee's job." *Duncan v. Thorek Mem'l Hosp.*, 784 F.

---

[8] Which is traditionally considered "full-time."

[9] Although still a lower hourly wage, it would have been more gross take-home pay.

Supp. 2d 910, 919 (N.D. Ill. 2011).  Because this essential element is missing, the Court need not

address the other elements of Mr. Stamm's claim.  Accordingly, Mikado's motion for summary

judgment on Mr. Stamm's race discrimination claims under § 1981 and Title VII is **GRANTED.**

### 2.    Retaliation

#### a.    Legal Principles

Although Mr. Stamm's discrimination claims fail, he may still pursue his claims for

retaliation.  "Unlawful retaliation occurs when an employer takes an adverse employment action

against an employee for opposing impermissible discrimination."  *Rogers v. City of Chi.*, 320

F.3d 748, 753 (7th Cir. 2003) (citations omitted).  Discrimination and retaliation claims are

distinct, and "a claim of retaliation does not depend on proof that any status-based discrimination

actually occurred."  *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 460 (2008).

As with a discrimination claim, a plaintiff asserting a claim of retaliation under Title VII

or § 1981 may choose to prove his case under either direct or indirect methods of proof.  *See*

*Weber v. Univs. Research Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir. 2010).  Under the direct

method, the plaintiff must present evidence that (1) he engaged in a statutorily protected activity;

(2) he suffered a materially adverse action; and (3) a causal connection exists between the

protected activity and the adverse action.  *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th

Cir. 2008).  If the plaintiff's evidence is contradicted, "the case must be tried unless the

defendant presents unrebutted evidence that it would have taken the adverse employment action

against the plaintiff anyway, 'in which event the defendant's retaliatory motive, even if

unchallenged, was not a but-for cause of the plaintiff's harm.'"  *Haywood v. Lucent Techs., Inc.*,

232 F.3d 524, 531 (7th Cir. 2003) (quoting *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d

640, 642 (7th Cir. 2002)).

Under the indirect method, the plaintiff must establish a *prima facie* case by showing that (1) he engaged in protected activity; (2) he suffered a materially adverse action; (3) he was meeting the employer's legitimate expectations; and (4) he was treated less favorably than a similarly situated employee who did not engage in protected activity. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). In determining whether retaliation has occurred, the Court is not required to consider "the nature of the discrimination that led to the filing of the [underlying] charge." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006). Mr. Stamm proceeds under the direct method.

### b.    **Mr. Stamm's Claim**

Mr. Stamm claims that in response to his EEOC complaint, Mikado instituted a discipline and discharge procedure that applied only to him, and that he was eventually terminated. Therefore, Mr. Stamm easily satisfies the first and second prong of a retaliation claim under the direct method:   he engaged in a statutorily protected activity and suffered an adverse employment action. *See Argyropoulos*, 538 F.3d at 733 (noting that termination is certainly an adverse action). The remaining issue is whether there was a causal connection between the two.

Mr. Stamm's direct evidence of a causal connection is cloaked in his argument that he was constructively discharged by Ms. Yu Mei Lee in early May 2010. Constructive discharge "occurs when working conditions become so unbearable that an employee is forced to resign." *Smith v. Bray*, 681 F.3d 888, 906 (7th Cir. 2012). In more explicit terms, the Seventh Circuit has stated, "[w]e can make it no plainer than to reiterate that constructive discharge refers to a situation in which an employee is not fired but quits." *Id.* (quotation omitted). Mr. Stamm does not argue that he quit, nor could he; the undisputed facts show that he was terminated in May 2010. Although Mr. Stamm contends he "considered himself terminated" in early May 2010, he

continued to communicate with Mikado, request time off, and work shifts until he was actually terminated on May 24, 2010.  Therefore, the Court rejects Mr. Stamm's constructive discharge claim.

However, Mr. Stamm alleges, which for the purposes of summary judgment the Court accepts as true, that Ms. Yu Mei Lee told him he had done a "very bad thing" by complaining to the EEOC and would be fired.  Mikado argues that despite this allegation, it had legitimate non-retaliatory reasons to terminate Mr. Stamm due to his insubordination and absenteeism.  The record includes multiple emails between Mr. Stamm and Ms. Connie Lee chronicling Mr. Stamm's requests and demands for time off, Ms. Connie Lee's grants or denials of the requests, Ms. Connie Lee's warnings given to Mr. Stamm, Mr. Stamm's protests, and Mr. Stamm's eventual termination.  The Court has read the emails produced, and finds the emails are "unrebutted evidence" that Mikado would have terminated Mr. Stamm even if it had no retaliatory motive.  Mr. Stamm's arguments, which focus solely on constructive discharge, do not rebut Mikado's position.  And the Court will not scour the record, *see Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001), on his behalf.

Therefore, Mr. Stamm has failed to produce a genuine issue of material fact that he was retaliated against in violation of Title VII.  Accordingly, Mikado's motion on this claim is **GRANTED**.

## B.   Claim under FLSA

Both parties seek summary judgment on Mr. Stamm's FLSA retaliation claim.

### 1.   Legal Principles

The FLSA protects workers from retaliation on the basis of filing a complaint, instituting a proceeding, or testifying in a proceeding regarding a complaint made under the Act.  29 U.S.C.

§ 215(a)(3).   To establish a retaliation claim under the FLSA, the plaintiff has the burden of demonstrating retaliatory conduct either through the direct or indirect method of proof.   *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 810 (7th Cir. 2005).   The standards are the same as a retaliation claim under Title VII.   Under the direct method of proof, a plaintiff must show by direct or circumstantial evidence, (1) a statutorily protected activity, (2) an adverse employment action, and (3) a causal connection between the two.   *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003).   "Direct evidence is evidence, which if believed by the finder of fact will prove the particular fact in question without reliance upon inference or presumption. Circumstantial evidence, which allows a jury to infer retaliation, may include:  (1) suspicious timing, ambiguous statements or behaviors; (2) evidence that similar situated employees were treated differently; or (3) a pretextual reason for adverse employment action."   *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972–73 (7th Cir. 2012) (internal quotations and citation omitted).   Under the indirect method of proof, the *McDonnell Douglas* burden-shifting framework applies.

### 2.      Mr. Stamm's Claim

Mr. Stamm proceeds under the direct method of proof.  First, Mr. Stamm claims that he complained to Mikado in March 2009 that he was not paid overtime, and that this complaint qualifies as a statutorily protected activity.  The Supreme Court has held that oral complaints can be statutorily protected activity, but that "a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."   *Kasten v. Saint-Gobain Performance Plastics Corp.*, __ U.S. __, 131 S. Ct. 1325, 1335 (2011).  The parties dispute whether Mr. Stamm's March 2009 complaint put Mikado on notice that Mikado's failure to pay

Mr. Stamm overtime was a violation of FLSA.  In Mr. Stamm's version of the facts, he worked in excess of 40 hours in February 2009, received a paycheck for less than anticipated, and complained that he had not been paid overtime.  In Mikado's version of the facts, Mr. Stamm was a salaried employee receiving $300.00 per week for 37 hours.  It mistakenly believed salaried employees were not entitled to overtime pay, but when Mr. Stamm complained that his February 2009 paycheck was too low, Mikado converted him into an hourly employee and paid him an extra $200.00 to settle the pay dispute.  Despite Mikado's argument that Mr. Stamm's complaint did not put it on notice of a FLSA complaint, the Court finds that Mikado's response to the complaint indicates that it was on notice that Mr. Stamm was exercising his right to overtime pay, which is granted under FLSA.

Additionally, Mr. Stamm claims he sent an email complaint to the Department of Labor about Mikado's illegal wage practices.  However, the email to which Mr. Stamm refers did not identify Mikado as his employer and was not a formal complaint.  Dkt. 36-6 at 25.  Moreover, there is no indication from the evidence that Mikado was aware of this email and could have acted in response.  Therefore, the Court finds it cannot serve as a basis for Mr. Stamm's retaliation claim.

Second, Mr. Stamm claims that his hours were reduced, and that he was denied the dishwasher position, in retaliation for complaining about overtime pay.  The Court has already determined that being denied a position as a dishwasher was not an adverse employment action.  That finding has equal force here.  However, the Court must determine if the reduction of Mr. Stamm's hours in April 2009 was an actionable adverse employment action.  An employment action that causes a reduction in the plaintiff's compensation generally qualifies as an adverse employment action.  *Firestine v. Parkview Health Sys., Inc.* 388 F.3d 229, 235 (7th Cir. 2004).

18

Therefore, "a reduction in hours could be an adverse action giving rise to liability." *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010). Because the parties do not dispute Mr. Stamm's hours were reduced, he has established an adverse employment action. *See Duncan v. Thorek Mem'l Hosp.*, 784 F. Supp. 2d 910, 919 (N.D. Ill. 2011); *Fulmore v. Home Depot, U.S.A., Inc.*, 423 F. Supp. 2d 861, 879 (S.D. Ind. 2006).

Third, Mr. Stamm contends there is a causal connection between the reduction in his hours in April 2009 and his complaint about overtime, made in March 2009. Mikado contends that Mr. Stamm's work hours were reduced in April 2009 because business was slow. Mr. Stamm acknowledged this reasoning in his EEOC charge of discrimination, in which he stated "On April 1, 2009, because business was slow I was told that my work hours would be reduced." Dkt. 35-1 at 6. However, Mr. Stamm presents circumstantial evidence to establish Mikado's reason was pretextual. This evidence includes: Mr. Stamm was the only back-of-the-house employee whose hours were reduced; Mr. Stamm's hours were given to a Hispanic employee; Mikado gave shifting reasons to the EEOC for its actions; and Mr. Stamm's complaint and the reduction in hours were temporally connected establishing suspicious timing. Moreover, while the Court found that Mr. Stamm did not suffer an adverse employment action when he was denied a dishwasher position, the Court finds Mikado's reasoning, that it did not want to give Mr. Stamm a dishwasher's schedule because it would be forced to pay him overtime, as another piece of circumstantial evidence. On the other hand, Mikado argues that Mr. Stamm's normal schedule was 37 hours per week. After he complained about overtime payment, Mikado chose not to schedule Mr. Stamm over 40 hours per week to avoid paying overtime, and when business was slow his hours were reduced further.

19

The Court concludes that there is a genuine issue of material fact on causation barring summary judgment for either party on the merits of Mr. Stamm's FLSA retaliation claim. Additionally, however, Mikado contends that Mr. Stamm's FLSA retaliation claim is barred by the two-year statute of limitation.  *Crowly v. Pace Suburban Bus Div. of Reg'l Transp. Auth.*, 938 F.2d 797, 801 (7th Cir. 1991).  Mr. Stamm contends Mikado has waived this argument, as it was raised in its reply brief.  The Court agrees.  "It is well established in [Seventh Circuit] precedents that 'skeletal' arguments may be properly treated as waived, as may arguments made for the first time in reply briefs."  *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011).  Under a generous interpretation, the only mention of a time limitation in Mikado's brief in support of its motion is a single statement that "Stamm never raised an FLSA claim until he filed his Amended Complaint in this action on April 12, 2012, almost 2 years after his employment terminated and more than 3 years after he resolved his one and only dispute over pay for hours worked."  Dkt. 35 at 28.  This statement does not suffice as even a cursory treatment of the issue that was later better developed in the reply brief.  *See Hernandez*, 634 F.3d at 913 (finding that cursory treatment of issue in opening brief, later developed in reply brief, had put other party on notice causing no prejudice).  Unlike *Hernandez*, Mikado's opening brief did not put Mr. Stamm on notice that the statute of limitation was at issue.  Therefore, the argument is waived.

Because there is a genuine issue of material fact about whether the reduction in Mr. Stamm's hours was causally connected to his overtime pay complaint, summary judgment for both parties is **DENIED**.

**C.**     **Mr. Stamm's Indiana Wage Claim and Breach of Contract Claim**

Mr. Stamm filed a wage claim with the Indiana Department of Labor on December 15, 2011.   He was granted leave to file a lawsuit against Mikado and thereafter amended his Complaint in this suit to add his wage claim under Indiana Code § 22-2-9-2(a), as well as a breach of contract claim.   Both claims challenge Mikado's sushi chef tipping policy.   Both parties seek summary judgment on these claims.

Mr. Stamm alleges that he was entitled to 50% of the sushi chef portion of tips at Mikado, based on what Ms. Connie Lee told him when he began working in December 2008. Mikado contends that its long-standing policy was that the assistant sushi chef, including Mr. Stamm, only received 40% of the sushi chef portion of tips.   It acknowledges that Mr. Stamm complained he was not receiving a 50% share in the summer of 2009, but that it explained to him the policy entitled him to only 40%.   Thereafter, Mr. Stamm continued working and accepting 40% without further complaint.   Mr. Stamm's state law claims therefore rest on his argument that Mikado improperly withheld 10% of tips to which he was entitled, and also breached his employment contract under which he was promised 50% of the sushi chef portion.

**1.**     **Breach of Contract**

The Court can easily dispose of Mr. Stamm's contract claim.   "It is well established in Indiana that contract modification can be implied from the conduct of the parties."   *Mark Line Indus., Inc. v. Murillo Modular Grp., Ltd.*, No. 3:10 CV 189, 2013 WL 393289, at *3 (N.D. Ind. Jan. 30, 2013); *Anderson v. Northeast Otolaryngology, P.C.*, No. 106CV0037, 2006 WL 3487333, at *3 (S.D. Ind. Dec. 1, 2006), *see also Gilliana v. Pniaguas*, 708 N.E.2d 895, 897 (Ind. Ct. App. 1999); *City of Indianapolis v. Twin Lakes Enters., Inc.*, 568 N.E.2d 1073, 1084–85 (Ind. Ct. App. 1991) ("[M]odification of a contract can be implied from the conduct of the

parties.").  Even assuming Mikado and Mr. Stamm entered into a contract entitling him to 50% of the sushi chef tips, the contract was modified by the parties' actions—Mikado in fact only paid Mr. Stamm 40% of the sushi chef tips and Mr. Stamm continued working after complaining about the alleged shortage.  Therefore, Mikado's motion for summary judgment on Mr. Stamm's breach of contract claim is **GRANTED** and Mr. Stamm's motion is **DENIED**.

### 2.    Wage Claim

Mikado argues that Mr. Stamm's wage claim is barred by the two year statute of limitations.  Alternatively, it argues Mr. Stamm waived his claim when he continued working at Mikado while only receiving 40% of sushi chef tips.  Mr. Stamm first responds that his wage claim relates back to the date of his original complaint, which was filed 19 months after he was terminated from Mikado and presumably the last date he claims tips were withheld.  Additionally, Mr. Stamm was required to exhaust his administrative remedies before filing his claim in this Court.  The Court agrees with Mr. Stamm and finds his claim is properly before the Court.  Second, Mr. Stamm argues that the wage claim statute does not require that employees must quit their employment to preserve a wage dispute.  However, Mr. Stamm cites no Indiana case law to support his claim that Mikado illegally withheld his tips and the Court finds the claim unsupported by fact or law.  Instead, Mr. Stamm raises for the first time that Mikado's tip policy violates the FLSA.  He argues that members of management participated in the sushi chef tip pool in violation of FLSA, thus he is entitled to those tips.  Mr. Stamm has not pleaded a FLSA violation claim to the Court, and these arguments do not establish a violation of Indiana Code § 22-2-9-2(a).

Accordingly, Mikado's motion for summary judgment on Mr. Stamm's breach of contract and Indiana wage claims is **GRANTED** and Mr. Stamm's motion is **DENIED**.

## IV.  CONCLUSION

For the reasons set forth above, Mikado's motion for summary judgment (Dkt. 34) is **GRANTED in part** and **DENIED in part**.  Mr. Stamm's motion for summary judgment (Dkt. 47) is **DENIED**.  The only claim that remains set for trial is Count III, Mr. Stamm's claim for retaliation under the FLSA.

**SO ORDERED.**

Date:  03/15/2013
_____

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Mark Kelly Leeman
markleeman@leemanlaw.com

Robert S. Rifkin
MAURER RIFKIN & HILL P C
rrifkin@mrhlaw.com